Lisa Beth ROSE et al., Petitioners,

v.

DOCTORS HOSPITAL et al.,
Respondents.

No. C–6535.

Supreme Court of Texas.

Dec. 19, 1990.

Dissenting Opinions of Chief Justice Phillips and Justice Doggett from Original
Opinion Filed Sept. 6, 1990.

Douglas D. Mulder, John H. Hagler, Ronald D. Krist, W. James Kronzer, Houston, for petitioners.

R. Brent Cooper, Robert A. Gwinn, Kenneth C. Stone, Michael W. Huddleston, Dallas, C.J. Francisco, Austin, for respondents.

## OPINION ON MOTION FOR REHEARING

COOK, Justice.

The motions for rehearing are granted in part and overruled in part. This court's opinion and judgment of September 6, 1990, are withdrawn, and the following is substituted in its place.

In this case, we once again consider the constitutionality of the damages provisions of the Medical Liability and Insurance Improvement Act, TEX.REV.CIV.STAT.ANN. art. 4590i, §§ 11.02 and 11.03 (Vernon Supp.1991) ("Medical Liability Act"), this time in the context of a wrongful death action. The court of appeals decided that the statutory damages limitations provisions are constitutional. 735 S.W.2d 244.[1] We decided subsequently to the court of appeals opinion that statutory damages limitations are unconstitutional when applied to damages in common law medical malpractice actions. *Lucas v. United States*, 757 S.W.2d 687, 692 (Tex.1988). Our holding in *Lucas*, however, did not extend to wrongful death actions. We now hold that the legislature may, through the Medical Liability Act, constitutionally curtail damages in wrongful death actions.

The case also presents procedural issues. We are asked to decide whether a remittitur becomes fatally defective when the party filing it in the court of appeals reserves the right to complain of the standard used in arriving at the remittitur. If such a remittitur is not defective, we must

---

**1.** The court of appeals reversed the trial court's judgment notwithstanding the verdict and rendered judgment for the Roses subject to suggested remittiturs. The Roses filed remittiturs in the amounts suggested by the court, but they reserved the right to complain of having been erroneously required to do so.

Doctors Hospital then filed a motion for rehearing complaining of the court of appeals' reversal and rendition; the hospital claimed the court of appeals should have remanded for a new trial since the remittiturs had been conditionally filed. The court of appeals agreed, and wrote an unpublished opinion which remanded the cause for a new trial.

The Roses and the hospital filed applications for writ of error complaining of all opinions written by the court of appeals. Our opinion in this case addresses the issues in all court of appeals opinions.

consider whether, in this particular case, the court of appeals did apply the wrong standard in arriving at the remittitur. We hold that a remittitur filed in the court of appeals is unaffected by a reservation of the right to appeal the standard used in arriving at the remittitur. We further hold that the court of appeals applied the correct standard in arriving at the remittiturs in this case.

## I. FACTS

The convoluted history of this case is partly explained in the original opinion of the court of appeals and in our opinion on application for writ of mandamus. 735 S.W.2d 244; 750 S.W.2d 177. For purposes of this opinion, we confine ourselves to a summary of the circumstances which brought to this court the issues we must decide today.

Rex Rose was admitted to Doctors Hospital and died there the next day. His widow, Lisa Beth, and his parents, Alton and Frances, brought a wrongful death action against the hospital, contending that Rex Rose had received a fatal dose of morphine while a patient at the hospital. The jury awarded $2,825,000 to Lisa Beth Rose and $815,000 each to Alton and Frances Rose, but the trial court rendered judgment notwithstanding the verdict.

The court of appeals reversed, holding that there was some evidence that the hospital caused Rex Rose's death. The court did, however, suggest remittiturs to reduce the damages awarded by the jury. Lisa Beth Rose's damages were reduced in accordance with § 11.02 of the Medical Liability Act. The court suggested a remittitur reducing Alton and Frances Rose's damages to the amount supported by the evidence.

The Roses responded by filing remittiturs within the time period prescribed by the court of appeals. However, the Roses expressly reserved the right to complain of the ruling requiring the remittiturs.

The Roses argue that the court of appeals was prohibited by the Texas Constitution and our decision in *Lucas* from reducing the damages awarded to Lisa Beth Rose. They also contend that the court of appeals applied an erroneous standard in reviewing the evidence to arrive at the remittitur. Doctors Hospital complains that the Roses filed a "conditional" remittitur, one which was defective because it amounted to a non-acceptance of the judgment of the court of appeals. We address each issue in turn.

## II. STATUTORY VALIDITY

In *Lucas,* the United States Court of Appeals for the Fifth Circuit asked this court to decide whether the limitation on medical malpractice damages in the Medical Liability Act is consistent with the Texas Constitution. We looked to the open courts provision of our constitution to determine whether that provision thwarted application of the damages limitations. The provision states:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13.

We noted that, in analyzing the litigant's right to redress under this provision, the litigant must satisfy two criteria. First, the litigant must have a cognizable common law cause of action that is being restricted. Second, the litigant must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Lucas,* 757 S.W.2d at 690; *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983).

The court initially acknowledged that victims of medical negligence have a well-defined common law cause of action to sue for injuries. *Lucas,* 757 S.W.2d at 690. The court then concluded that the statutory damages limitations provisions at issue met the second criterion, that is, they were unreasonable and arbitrary when balanced against the purpose and basis of the statute. *Id.* at 690–92. Having reached these

conclusions, the court decided that the damages limitations provisions were unconstitutional "as applied to catastrophically damaged malpractice victims seeking a 'remedy by due course of law.'" *Id.* at 690.

Notwithstanding the specific application of the *Lucas* holding to catastrophically damaged malpractice victims, the Roses argue that the holding voids the statute in all respects and for all applications. We disagree.

We note initially that *Lucas* was a certified question. We were authorized by TEX. CONST. art. V § 3–c and the implementing rules of appellate procedure to answer the question, which was in part "[w]hether the limitation on medical malpractice damages in TEX.REV.CIV.STAT. ANN. art. 4590i, §§ 11.02 and 11.03 (Vernon Supp.1991) is consistent with the Texas Constitution." *Lucas,* 757 S.W.2d at 687. Any response other than that necessary to answer the question authorized by the Constitution or the enabling rules would be dicta. Rule 114 makes clear that answers to certified questions are allowed only as long as "there are involved in the proceedings before the certifying court questions of law of this state which may be determinative of the cause then pending." Tex.R. App.P. 114(a). Under that rule, we did not decide, as the Roses contend we did decide, that the limitation on wrongful death— rather than medical malpractice—damages—is inconsistent with the Texas Constitution. To do so would have been to decide a "cause not then pending before the certifying court," a cause involving wrongful death rather than common law medical malpractice.

For further support for the proposition that the statute is not void, we turn to the statute's severability clause. It states in part that if the application of the statute to any person or circumstance is held unconstitutional, then the effect of the invalidation shall be confined to the portion of the statute adjudged to be unconstitutional. Act of Aug. 29, 1977, ch. 817, § 41.04. In *Lucas,* it was the "application" of the statute to the "circumstance" of a common law medical malpractice claim which was held to be unconstitutional. The "effect" of that holding is the inapplicability of §§ 11.-02 and 11.03 to common law medical malpractice claims. According to the severability clause, this effect—and this effect only—is confined to §§ 11.02 and 11.03.

The goal of this severability clause, to retain valid portions and applications of the statute whenever possible, reflects the case law's reminder that "[i]n the construction of statutes, if it can be lawfully done, it is the duty of the court to construe a statute so as to render it valid." *Sharber v. Florence,* 131 Tex. 341, 345, 115 S.W.2d 604, 606 (1938). In *Western Union Telegraph Co. v. State,* 62 Tex. 630 (1884), we acknowledged that some statutes are severable while others are not and stated the test for determining when a finding of unconstitutionality of one portion of a statute invalidates the whole statute:

> When, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.

*Id.* at 634.

When we consider the *Western Union* test in the context of §§ 11.02 and 11.03,

we recognize the statute's validity. These sections cover "health care liability claims." The statutory definition of such claims expressly mentions both common law personal injury and wrongful death claims. TEX.REV.CIV.STAT.ANN. art. 4590i, § 1.03(4) (Vernon Supp.1991). According to the *Western Union* test, if, when we strike the statute's application to the common law claims, we are left with something which "remains complete in itself, and capable of being executed in accordance with the legislative intent, wholly independent of that which was rejected, it must stand." *Western Union*, 62 Tex. at 634. The application of §§ 11.02 and 11.03 to wrongful death claims remains complete in itself, capable of execution in accord with the legislature's intent, and independent of any application to common law claims. The statute, therefore, can be severed, leaving a valid law.

To reach any other conclusion would be to ignore not only the intent of the legislature and the specific holding in *Lucas*, but also our traditional distinction between common law personal injury and statutory wrongful death claims. We recognized this distinction in *Lucas*, restating the traditional rule that the open courts provision of our constitution applies only to common law claims. We relied upon this distinction to strike application of §§ 11.02 and 11.03 to common law medical malpractice claims. Had we faced a wrongful death claim in *Lucas*, we could not have reached the same conclusion, for the open courts provision does not apply to statutory claims. Can we now rely upon *Lucas* to do something we may not do under the law as delineated in *Lucas* itself, that is, declare the statute unconstitutional in the context of wrongful death claims? We think not. For this and all the other reasons discussed, we conclude that we are construing a statute which may be validly applied to all but common law claims.

## III. CONSTITUTIONALITY OF STATUTORY DAMAGES PROVISIONS

To determine whether the open courts provision prevents constitutional applica-

tion of the Medical Liability Act in the case before us today, we are guided by the two-prong analysis in *Lucas*. We ask first whether the Roses' remedy is based upon a cognizable common law cause of action. If the remedy was so grounded, then the open courts provision prevents application of the Medical Liability Act in this case.

■■■ Like all actions based upon theories of negligence, the Roses' cause of action was a common law claim. It would have died with Rex Rose had it not been preserved by the legislature in the wrongful death statute. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 71.001 *et seq.* (Vernon 1986). The Roses' remedy, therefore, was conferred by statute, not by the common law. Because the Roses do not seek a common law remedy, the open courts provision does not apply to their wrongful death claim. Accordingly, we hold that the open courts provision may not bar the application of the damages provisions of the Medical Liability Act in wrongful death cases.

Further arguments concerning the application of the open courts provisions to statutory wrongful death actions are effectively deflected by our recent holding in *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348 (1990). In that decision, we followed a steady line of Texas Supreme Court decisions holding that there is no common-law cause of action for wrongful death. *Id.* at 366. *Moreno* establishes that it is the actions of the legislature itself, not the open courts provision, which modify wrongful death actions.

The Rose petitioners further argue that the Medical Liability Act's damages provisions violate the equal protection clauses of the federal and our state constitutions. This is so, argue the Roses, because application of the statute differentiates between classes of litigants asserting common law medical malpractice claims and those asserting wrongful death claims. To prevail upon this claim the Roses must overcome the longstanding presumption in favor of an act of the legislature. *See Sax v. Vot-*

*teler*, 648 S.W.2d 661, 664 (Tex.1983). The Roses have not met this burden with regard to either the Medical Liability Act or the wrongful death statute.

■ The United States Constitution provides that no state shall deny any person within its jurisdiction the equal protection of the laws. U.S. CONST. amend XIV, § 1. Our state constitution provides that all free men have equal rights. TEX. CONST. art. I, § 3. Texas cases echo federal standards when determining whether a statute violates equal protection under either provision. *See, e.g., Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 559–60 (Tex.1985).

Those standards dictate that, when the classification created by a state statute does not infringe upon fundamental rights or does not burden an inherently suspect class, equal protection requires only that the statutory classification be rationally related to a legitimate state interest. *Id.* at 559. No fundamental rights or suspect classes are involved in this case. Equal protection requires, therefore, that the Wrongful Death Statute and the Medical Liability Act merely be rationally related to a legitimate state interest.

■ The wrongful death statute confers a cause of action only upon the surviving spouse, children, and parents of the deceased. TEX.CIV.PRAC. & REM.CODE ANN. § 71.004 (Vernon 1986). The restriction on class of beneficiaries reflects the state's interest in ensuring compensation for only those persons who normally have had the closest relationship to the deceased and who suffer the most from his death. *See Castillo v. Hidalgo County Water Dist. No. 1*, 771 S.W.2d 633, 635 (Tex.App. —Corpus Christi 1989, no writ). The restrictive terms of the statute, therefore, relate rationally to an interest of the state. Equal protection is not violated.

The Medical Liability Act delineates the interests of the state in a list of purposes found at the beginning of the statute. TEX.REV.CIV.STAT. art. 4590i, § 1.02(b) (Vernon Supp.1991). These purposes include the reduction of excessive severity of health care liability claims, decreasing the cost of those claims, making insurance at reasonably affordable rates available to health care providers, and making affordable health care more accessible and available to the public. *Id.* The method by which the legislature chose to effect those purposes is outlined in §§ 11.02 and 11.03, the damages provisions. The damages provisions rationally relate to the interests of the state as stated in the statute's list of purposes. The statute, therefore, does not violate equal protection.

## IV. DAMAGES CALCULATION

■ Each party suggests a different method for calculation of damages in a wrongful death damages cap case. We hold that the amount of damages under § 11.02 is to be calculated on a "per defendant" basis.

The damages cap provision of article 4590i provides:

In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.

Tex.Rev.Civ.Stat.Ann. art. 4590i § 11.02(a) (Vernon Supp.1991).

This court indicated in *Baptist Hospital of Southeast Texas, Inc. v. Baber*, 714 S.W.2d 310 (Tex.1986), that the damages cap provision is to be applied on a "per defendant" basis. In *Baber*, we stated that the court of appeals need not have decided the case on constitutional grounds since the judgment in the case did not exceed "the combined statutory liability of both defendants." *Id.* The judgment in that case was $1.3 million for Mrs. Baber and other wrongful death and survival statute claimants against Baptist Hospital and Dr. Campbell jointly and severally. The damages cap amount, as adjusted under article 4590i § 11.04, was $804,419. The

judgment in the case did not exceed $804,-419 multiplied by two—the number of culpable defendants in the case.

It is clear that the damages cap amounts should be calculated on a "per defendant" basis because the language of § 11.02(a) clearly applies to the recovery against the individual defendant, not the award to the individual plaintiff. Plaintiffs who recover against more than one defendant may therefore obtain a judgment in excess of the cap, so long as the combined statutory liability of all defendants is not exceeded.

Thus, the amount of damages in this case is the damages cap of $500,000, plus a consumer price index adjustment to the present (*see* Tex.Rev.Civ.Stat.Ann. art. 4590i § 11.04), multiplied by two since there are two culpable defendants in this case.[2] Judgment is hereby rendered accordingly.

## V. REMITTITURS

The remittitur dispute in this case highlights opposing perceptions of the nature and purpose of remittiturs. Doctors Hospital argues that a remittitur is a "take-it-or-leave-it" offer, one which allows a party no options other than straightforward acceptance or rejection. Once a party accepts the remittitur, he consents to the judgment and may not reserve a right to complain of it later. Doctors Hospital's position is that any response to a remittitur other than outright acceptance, including reservation of the right to appeal the remittitur, makes the remittitur conditional and constitutes rejection of the judgment. Under these circumstances, argues Doctors Hospital, a court of appeals has no choice but to remand for a new trial.

The Roses argue that a party may file a remittitur in the court of appeals but expressly reserve the right to complain of it on motion for rehearing and in application for writ of error to this court. The Roses

not only reserved but exercised that right in this case. They argue that Doctors Hospital's rigid notion of the options available to a remitting party would deprive a litigant of his right to appeal and deprive this court of jurisdiction to decide on appeal certain issues which have traditionally come within the power of this court to address.

Critical to the Rose position is the assumption that a party complaining of a court of appeals' suggestion of remittitur has the right to appeal the imposition of the remittitur, irrespective of whether he reserves rights in the remittitur. If a party does not have that right, then a reservation of the right to appeal is meaningless. Only if the party has the right to appeal a remittitur can the question arise whether a reservation of rights contained within the remittitur filing itself destroys the right to appeal.

■ Rule 85(c) of the Texas Rules of Appellate Procedure addresses the function of remittiturs on appeal. The rule provides that, if a court of appeals believes that a trial court should have suggested a remittitur, the court of appeals may suggest one. Texas case law instructs that the standard of review is one of factual sufficiency. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex.1987). If the remitting party files the remittitur, then judgment is reformed and affirmed in accordance with the remittitur. If the party declines to file the remittitur, then judgment is reversed. Tex.R.App.P. 85(c).

Rule 85(c) does not contain restrictions upon the remitting party's right to appeal. We find no Texas authorities to support the contention that the right to appeal the court of appeals' final judgment, whether a reversal or a reformation and affirmation, is in any way affected by the terms of Rule 85(c). On the contrary, this court is unquestionably empowered to review judg-

---

**2.** We do not address the applicability of this damages calculation to the comparative negligence situation. This case does not involve a

situation in which any defendant is less than completely liable.

ments resulting from the imposition of Rule 85(c) because those judgments are predicated upon the court of appeals' conclusion that the evidence is insufficient to sustain the trial court's judgment. *Larson*, 730 S.W.2d at 641. Like all legal and factual sufficiency determinations, the standards used in arriving at suggestions of remittitur are subject to examination by this court and may form the basis of a party's appeal. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988), *citing Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634–35 (Tex.1986).

■ We now turn to the question whether the reservation of a right to appeal contained within the remittitur destroys the right to appeal. We believe that a litigant's right to appeal and the obligations of this court to review a remittitur suggestion outweigh any confusion that may be caused by the remitting party's reservation of rights. The party including such a reservation has stated nothing more than the obvious, that is, that he has a right to appeal the judgment. As long as the remitting party makes it clear to the court of appeals that he is accepting the suggestion of remittitur and the consequent reformation of the judgment, additional language reserving the right to appeal amounts to mere surplusage. Accordingly, we hold that a reservation of the right to appeal contained in an otherwise valid remittitur does not amount to a rejection of the remittitur.

■ Our final inquiry focuses on the standard used by the court of appeals in this case to arrive at the remittitur. As we have stated, the standard is factual sufficiency. *Larson*, 730 S.W.2d at 641. To enable this court to determine whether the standard has been properly applied, the court of appeals is obligated to detail and analyze the evidence. *See Pool*, 715 S.W.2d at 633–35 (Tex.1986). In this case, the court of appeals has dutifully accomplished the task of analyzing the evidence. We are thus able to conclude that the court

of appeals applied the proper standard in arriving at the remittitur.

In conclusion, we hold that the damages provisions of the Medical Liability Act are constitutional when applied to wrongful death actions. We hold that damages under the damages cap provisions are to be calculated on a "per defendant" basis. And finally, we hold that a reservation of rights in a remittitur filed in a court of appeals does not deprive a remitting party of the right to appeal. The judgment of the court of appeals is reversed insofar as it remands for a new trial and affirmed in all other respects. Judgment is rendered for the Roses in accordance with this opinion.

PHILLIPS, C.J., and DOGGETT, J., dissent joined by RAY and MAUZY, JJ.

PHILLIPS, Chief Justice, dissenting.

The basic issue in this case is whether the legislative limits on medical malpractice liability, Tex.Rev.Civ.Stat.Ann. art. 4590i §§ 11.02, 11.03 (Vernon Supp.1990), are unconstitutional as applied to statutory causes of action as well as common-law actions. I believe we resolved this question by our holding in *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988). Therefore, I am compelled to dissent.

In *Lucas*, the United States Court of Appeals for the Fifth Circuit certified the following questions to us:

> Whether the limitation on medical malpractice damages in Tex.Rev.Civ.Stat. Ann. art. 4590i §§ 11.02 and 11.03 (Vernon Supp.1986) is consistent with the Texas Constitution, and if so, whether it applies to limit the liability of each defendant rather than the recovery of each claimant.

*Lucas v. United States*, 811 F.2d 270, 271 (5th Cir.1987). By answering the first question in the negative, we struck down the medical malpractice "caps" without regard to the type of action being asserted.

Today, however, the court states: "Our holding in *Lucas* ... did not extend to wrongful death actions." At 842. To sup-

port this proposition, the court relies on selected language from *Lucas* that seemingly limits its scope to actions by injured persons as opposed to survivors.[1] Ignored are different portions of the opinion indicating that the entire provision was struck down, not just its application to personal injury claims.[2] While this ambiguity is unfortunate, both federal and state courts have applied *Lucas* to wrongful death as well as injury actions. *See, e.g., Wheat v. United States*, 860 F.2d 1256, 1259 (5th Cir.1988); *Mercy Hospital of Laredo v. Rios*, 776 S.W.2d 626, 637 (Tex.App.—San Antonio 1989, writ denied). I too would read our holding more broadly.

Perhaps because of this conflict, the court also holds that under Texas Rule of Appellate Procedure 114, which implemented our certified question procedure, our response in *Lucas* was dicta insofar as it applies to wrongful death rather than common-law malpractice actions. At 844. This holding, I fear, may seriously undermine the effectiveness of our certified question procedure.

The Texas Constitution removes the case or controversy restriction on our jurisdiction so that, when both federal and state courts are willing, federal appellate courts will not have to undertake an *"Erie* guess" on unresolved questions of state law. Tex. Const. art. V, § 3–c. Our rule, promulgated pursuant to this constitutional authority, provides that we may answer questions certified to us "if there are involved in any proceedings before the certifying court questions of law of this state which may be determinative of the cause then pending and as to which it appears to the certifying court that there is no controlling precedent in the decisions of the Supreme Court of Texas." Tex.R.App.P. 114(a).

The court concludes today that the first question posed in *Lucas* was not "determinative of the cause then pending" because it could have been framed more narrowly. I agree that the question could have been asked differently, but I strongly disagree that it had to be.[3] Our answer to the question as posed was sufficient to enable the federal court to apply state law in deciding the case before it. That a narrower question would also have been determinative does not deprive us of the authority to answer the question as asked, nor does it deprive our response of precedential value. If no answer to a certified question

---

1. The court in *Lucas* said: "[W]e ... conclude that the liability limits ... are unconstitutional as applied to catastrophically damaged malpractice victims seeking a 'remedy by due course of law.'" 757 S.W.2d at 690. The Court further stated: "Texas courts have long recognized that victims of medical negligence have a well-defined common law cause of action to sue for injuries negligently inflicted upon them." *Id.* Moreover, the court said: "In the context of persons catastrophically injured by medical negligence, we believe it is unreasonable *and* arbitrary to limit their recovery in a speculative experiment to determine whether liability insurance rates will decrease." *Id.* at 691. Finally, the court held: "[W]e hold it is unreasonable and arbitrary for the legislature to conclude that arbitrary damage caps, applicable to all claimants no matter how seriously injured, will help assure a rational relationship between actual damages and amounts awarded." *Id.*

2. At the beginning of its opinion, the court stated the certified questions and answered unequivocally "that the damages limitations contained in Sections 11.02 and 11.03 of article 4590i violate article I, § 13 of the Texas Consti-

tution." 757 S.W.2d at 687. Likewise, at the end of its opinion, the court held: "[O]ur answer to the certified question is that the limitation on medical malpractice damages in Tex. Rev.Civ.Stat.Ann. art. 4590i, §§ 11.02 and 11.03, is inconsistent with and violative of article I, section 13, of the Texas Constitution." *Id.* at 692.

3. I also question whether this court, at this late date, has any right to inquire whether the question posed by the Fifth Circuit in *Lucas* was appropriate. As we said in *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348 (Tex.1990), the certified question process "is a very limited procedural device; we answer only the questions certified and nothing more." *Id.* at 349. We also noted that "the whole case is not before this court as it would be in an ordinary appeal." *Id.* While this court has an obligation to ensure that the certified question is asked in good faith and is capable of resolution as a matter of law, we must ordinarily rely on the expertise of the certifying court to frame correctly the precise issue for our determination.

can have precedential value if the question could have been framed with greater specificity or precision, our decisions in such cases will be of little use beyond the federal case in which our assistance was invoked.[4]

Even if the court is correct that the *Lucas* holding does not extend to actions for wrongful death, however, I still believe that *Lucas* controls this case. In striking down the caps in common-law causes of action, we of necessity also struck them down in statutory proceedings unless the statute is severable.

In embarking upon a severability analysis, the primary focus must be on the intention of the legislature. *See* N. Sanger, *Sutherland Statutory Construction* § 44.03 (Sands 4th ed. 1986 rev.). Indeed, it is the "duty of a court to ascertain and give effect to legislative intent concerning severability of a statute." Tex.Gov't.Code Ann. § 312.013 (Vernon 1988). "The test for severability in the absence of an express severability clause is one of legislative intent." *The Association of Texas Professional Educators v. The State Commissioner of Education,* 788 S.W.2d 827, 830 (Tex.1990). Conversely, the existence of a severability clause is an aid to finding such a legislative intent. It is not, however, conclusive. As Justice Brandeis said in *Dorchy v. State of Kansas,* 264 U.S. 286, 290, 44 S.Ct. 323, 324–25, 68 L.Ed. 686 (1924), a savings clause provides a rule of construction which may aid in determining legislative intent, but "it is an aid merely; not an inexorable command."

In this instance, I find the language of the severability clause singularly unhelpful. While it provides that the unconstitutionality of one "application" of a provision does not affect other "applications" thereof, it also provides that the "effect" of striking down a provision shall be confined "to the clause, sentence, subsection, section, article or provision" held invalid.[5] If the legislature had used "application" in both portions of the clause, its intent would probably be clear. As it is, however, I find neither an aid nor a command in this confusing language.

The inquiry, therefore, is whether "the invalid part is so intermingled with all parts of the act as to make it impossible to separate them, and so preclude the presumption that the Legislature would have passed the act anyhow." *Sharber v. Florence,* 131 Tex. 341, 345, 115 S.W.2d 604, 606 (1938). *See also, Western Union Telegraph Co. v. State,* 62 Tex. 630, 634 (1884). While the issue is close, I cannot conclude that in the absence of any limitation on actions for personal injury, the legislature nonetheless would have provided a ceiling on claims for wrongful death.

Two separate factors suggest that the legislature never intended for section 11.02 to be severable. First, the internal "severability clause" in section 11.03 indicates that the legislature never contemplated the

---

**4.** The problem with *Lucas,* if any, did not arise from the way the Fifth Circuit framed the question, but from the fact that we answered it without reservation or qualification. Before we handed down *Lucas,* on May 11, 1988, this court had already heard oral arguments for the first time in this case. The arguments and briefs of the parties, as supplemented by post-submission briefs, dealt extensively with the constitutional significance of whether a cause of action is legislatively or judicially created. If we found this distinction arguably persuasive, we should have raised it in our various *Lucas* opinions. Instead, we answered the question without restriction, and that answer controls the case at bar unless we choose to modify *Lucas.*

**5.** The complete severability clause is as follows:

If any provision of this statute or its application to any person or circumstance is held invalid or unconstitutional, such invalidity does not affect other provisions or applications of this statute which can be given effect without the invalid clause, sentence, subsection, section, article, or provision or application, and shall not affect, impair, invalidate, or nullify the remainder of this Act, but the effect thereof shall be confined to the clause, sentence, subsection, section, article or provision of the Act so adjudged to be invalid or unconstitutional and to this end the above are declared to be severable.
Tex.Rev.Civ.Stat.Ann. art. 4590i note, Acts 1977, ch. 817, § 41.04 (Vernon Supp.1990).

severance of different applications of the damages cap in section 11.02. The wording and legislative history of section 11.03 suggest that the legislature only intended it to be severable from the entirety of the section 11.02(a) limitations, as opposed to a particular application thereof:

> Sec. 11.03. In the event that Section 11.02(a) of this subchapter is stricken from this subchapter or is otherwise invalidated by a method other than through legislative means, the following shall become effective: ....

Tex.Rev.Civ.Stat.Ann. art. 4590i, § 11.03 (Vernon Supp.1990). This language was included after the legislature approved Representative Powers' proposed amendment to H.B. 1048. Representative Powers explained the amendment to the House:

> If the rest of this section, in other words, the limit or cap of $500,000 were to be declared unconstitutional or invalid for any reason by a court, [by] some other means [other] than the legislature, then just pain and suffering limitations of $150,000 would stay in the Bill, except in a case of disfigurement.

Representative Henderson, speaking against the amendment, described it in similar terms:

> UNIDENTIFIED SPEAKER: Mr. Henderson, there is, already, an internal cap under the Bill, is there not? Is there not a provision that if the Court finds the $500,000 cap which the study commission did not recommend, but which we placed in there for the physicians, is found to be unconstitutional, we would revert to $150,000 pain and suffering cap, do we not?
>
> REP. HENDERSON: That's correct, we provide that as a contingent.

Transcription of Tapes of Formal Meeting of House Committee on State Affairs, March 14, 1977, at 183.

Thus, there is no indication of a legislative intent to sever the liability caps in section 11.02 into distinct applications. The legislature only contemplated that the $500,000 cap might be struck down, in which case only the $150,000 pain and suffering cap in section 11.03 would remain.

Second, in 1977, high damage awards in common-law personal injury cases were of much greater concern to the legislature than awards in wrongful death cases. There is nothing in the findings of the Keeton Commission Report,[6] upon which the Act was based, to suggest that the legislature would or should impose damages limitations in wrongful death cases alone. Although the Keeton Commission recommended only a cap on damages recoverable for pain and suffering, it cited large recoveries in personal injury cases as a factor contributing to the escalating health insurance costs in Texas in the 1970s. The Commission found it "apparent that substantial reductions in settlements and judgments in those cases involving severe injuries will have a significant impact on insurance costs and the pure premium rate." Keeton Commission Report, at 6.

Further, when the legislature enacted the Medical Liability and Insurance Improvement Act in 1977, damages recoverable under the Wrongful Death Act were very limited in comparison to those recoverable in common-law personal injury actions. Prior to our decision in *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983), damages recoverable under the Wrongful Death Act were limited by the pecuniary loss rule. *See March v. Walker*, 48 Tex. 372, 375

---

**6.** In 1975, the 64th Legislature created the Medical Professional Liability Study Commission, known as "the Keeton Commission" in reference to its chairman, W. Page Keeton. *See* Note following Tex.Ins.Code, Tex.Rev.Civ.Stat.Ann. art. 21.49–3 (Vernon 1981). For twenty-two months the Commission studied the causes of the alleged "medical malpractice crisis." It made recommendations to the 65th Legislature in its report entitled "Final Report of the Texas Medical Professional Liability Study Commission to the 65th Texas Legislature." In enacting the Medical Liability and Insurance Improvement Act in 1977, the legislature explicitly adopted the findings of this commission. *See* Tex.Rev.Civ.Stat.Ann. art. 4590, § 1.02(13) (Vernon Supp.1990).

(1877). The large recoveries achieved in common-law personal injury cases in the 1970s, therefore, were the primary focus of the legislature's concerns. Indeed, the initial draft of the Medical Liability and Insurance Improvement Act provided for a damages cap of $500,000 only in personal injury cases and for no cap in wrongful death cases.[7]

Undoubtedly, the legislature could have enacted a separate cap for wrongful death actions, and such a cap would not have violated the open courts provision of our constitution. *See Moreno v. Sterling Drug*, 787 S.W.2d 348, 355–57 (Tex.1990). The language of sections 11.02 and 11.03, and the circumstances surrounding their passage, however, demonstrate that the legislature did not intend for section 11.02 to be severable and would not, in 1977, have passed a liability cap on wrongful death claims without a cap on personal injury claims.

As the statutory provisions are not severable, our holding in *Lucas*, even if limited to common-law actions, compels a similar result in the case at bar. While I strongly and extensively disagreed with *Lucas*, *see* 757 S.W.2d at 702–21 (Phillips, C.J., dissenting), I would not disturb so recent a constitutional decision by our court. I am also unwilling, as I believe the court has done, to restrict the scope of the decision by imposing a retroactive qualification upon our answer to the certified question.

Before it applied the Medical Liability and Insurance Improvement Act, the court of appeals found sufficient evidence to support the jury's verdict, subject to suggested common-law remittiturs. The petitioners each filed remittiturs in the suggested amounts. I agree that the court of appeals applied the correct standard in deriving its suggested common-law remittiturs. I would therefore affirm the judgment of the court of appeals in part and reverse it in part, rendering judgment that Alton Rose and Frances Rose each recover $815,000 from Doctors Hospital, less remittiturs of $230,000 and $315,000, respectively, and that Lisa Rose recover $2,825,000 from Doctors Hospital, less a remittitur of $500,000 plus interst and costs.

DOGGETT, Justice, dissenting.

Once again eagerness to implement a desired social policy has produced a result both inconsistent with established jurisprudence and incongruent with the appropriate role of the judiciary. Masquerading as a defender of judicial restraint, the court trespasses upon the function of the redrafting of legislation, a power reserved to another branch of government. The court's surgical dissection of provisions of the Medical Liability and Insurance Improvement Act, Tex.Rev.Civ.Stat.Ann. art. 4590i (Vernon Supp.1990), in an effort to preserve damage limitations in wrongful death actions contravenes both the clear language of the statute and over a century of compelling Texas precedent.

The court's strategy in this endeavor is to ask and answer questions not relevant to our inquiry. The fundamental question presented by this appeal is not, as the court suggests, the applicability of the "open courts" provision, article 1, section 13 of the Texas Constitution, as considered in *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988), or the appropriateness of a statutory distinction between personal injury and death, before us in *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348 (Tex.1990). Nor need we consider whether the legislature should or could, consistent with our constitution, limit damages recoverable in actions for wrongful death based upon medical malpractice. Rather, the only question presented is one of constitutional law and statutory construction: whether the partial unconstitutionality of a statute

---

7. Representative Tom Uher offered the amendment to House Bill 1048 which applied the caps to both injury and death cases. The amendment was approved by the House and was incorporated into the Act. *See* Transcription of Tapes of Formal Meeting of House Committee on State Affairs, March 14, 1977, at 35, 36, 205.

invalidates the remainder. Today's decision, in answering this question, misapplies over a century of precedent written by this court.

We first addressed the issue of the effect of the invalidity of a statutory provision in *Western Union Telegraph Co. v. State*, 62 Tex. 630 (1884). There we considered whether a statute purporting to tax telegraph messages, which was held unconstitutional by the United States Supreme Court to the extent imposed on interstate messages, could be constitutionally applied to intrastate messages only. We held that it could not, stating that the partial invalidity of a statute voids the remainder when the provisions are so interdependent and connected in subject-matter as to be inseparable:

> The point is ... whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.

62 Tex. at 634 (quoting from Cooley's Const. Lim., 215). Unlike today's opinion, in *Western Union* the proper standard was not only enunciated but also applied. We held that, because the statutory provisions could not be separated between interstate and intrastate messages, "the different parts of the act are so intimately connected that the invalidity of a part of the law renders the entire law invalid." *Id.* at 636.

Similarly, in *Sharber v. Florence*, 131 Tex. 341, 115 S.W.2d 604 (1938), also cited by the court today, we considered the effect of partial unconstitutionality of a moratorium statute *and held the entire statute invalid.* The act postponed sales of property under executions or orders of sale, or under deeds of trust, mortgages or other contracts giving any power of sale of real property, and annulled other similar sales. The statute had been repeatedly held unconstitutional to the extent it purported to change the method or time of sale with respect to purely private contracts prescribing the mode of enforcement. The issue before the court was whether the statute was constitutional as to those contracts not prescribing a method of enforcement, *i.e.*, those in which no valuable rights were affected. Echoing the test set forth in *Western Union*, we stated:

> This Court has repeatedly held that if part of an act is declared invalid it does not destroy the entire act, unless the invalid part is so intermingled with all parts of the act as to make it impossible to separate them, and so preclude the presumption that the Legislature would have passed the act anyhow.... It is also clear that, where a statute contains provisions which are legal, and others which are not, effect may be given to the legal provisions by separating them from the illegal. *But this rule applies only to a statute where the provisions are separable and not dependent one upon the other; and does not support the contention that that which is inseparable may be separated.*

131 Tex. at 345–46, 115 S.W.2d at 606 (emphasis supplied).[1] Examining the statute and applying the formulated rule of partial invalidity, we concluded that:

> its parts are so intermingled that, if any of the parts are valid, they cannot be separated from the invalid. In the form that this law was enacted, when its purposes are analyzed there is no possibility of separating them so that each part remains as complete in itself and capable of being executed in accordance with the legislative intent, wholly independent of those parts which are rejected as being unconstitutional.

*Id.*, 131 Tex. at 346, 115 S.W.2d at 607.

This same analysis has been applied to strike an entire notice provision held to be

---

1. *Accord* N. Sanger, *Sutherland Statutory Construction* § 44.03 (Sands 4th ed. 1986 rev.) (test whether the legislature intended the act to be separable *and* whether the act is separable *in fact*). The second prong of this test is dispositive in this cause.

unconstitutional when applied in certain situations. In *Hanks v. City of Port Arthur*, 48 S.W.2d 944 (Tex.1932), we determined that Port Arthur's attempt to preclude liability through its municipal charter by requiring that it be notified of a defective condition prior to the occurrence of an injury was unconstitutional under the "open courts" provision to the extent notice of defects was required from those who had no knowledge of them. The enactment did not remain valid under the more limited circumstances when the injured party had actual knowledge of a defective condition, but rather this court was compelled to void the notice provision in toto. Because no distinction was made in the charter language between valid and invalid applications, we refused to rewrite it, concluding that *"the plain terms, however, of the notice section do not permit us to make these eliminations"* of situations in which applying the notice provision would be unconstitutional. 48 S.W.2d at 950 (emphasis supplied).

These cases establish a well-recognized set of statutory and constitutional rules that have been consistently followed in our jurisprudence. In fact, not but a few months ago this court, in a unanimous decision, applied them to strike an entire legislative act when one provision was found invalid. *Association of Texas Professional Educators v. State Commissioner of Education*, 788 S.W.2d 827 (Tex.1990). Intermediate appellate Texas courts have relied upon and consistently applied these well-established rules by looking to the language of the particular statute to determine severability. *See, e.g., City of Taylor v. Taylor Bedding Manufacturing Co.*, 215 S.W.2d 215 (Tex.Civ.App.—Austin 1948, writ ref'd); *San Antonio Independent School District v. State*, 173 S.W. 525 (Tex. Civ.App.—San Antonio 1915, writ ref'd); *City of Forney v. Estate of Pinson*, 575 S.W.2d 58, 61 (Tex.Civ.App.—Texarkana 1978, writ ref'd n.r.e.) ("after the invalid parts have been severed, there must remain an intelligible and valid ordinance capable of being placed in execution and conforming to the *general purpose* and *intent* of the enacting body."). Today's opinion stands in stark contrast to this venerable body of law, as it superficially recognizes controlling principles but completely fails to apply them in any meaningful or logical manner.

In evaluating whether any portions of sections 11.02 and 11.03 of the Act, held unconstitutional in *Lucas*, remain valid, our focus is not what the legislature could or might have done in drafting the statute, but what it has done and the extent to which the invalid and valid portions of the statute are severable. If the unconstitutional and constitutional provisions are inseparably connected, we cannot engage in judicial legislation by rewriting the statute as the legislature could or might, but must strike the statutory provisions in their entirety. *Ex parte Levinson*, 160 Tex.Crim. 606, 274 S.W.2d 76, 78 (1955) (court may strike portions of the statute but may not rewrite, change or add to the law).

Sections 11.02 and 11.03 purport to limit damages in "an action on a *health care liability claim.*" The term "health care liability claim" is used throughout the statute, appearing some twenty-three times, and encompasses *both* statutory and common-law causes of action.[2] Based on the Act's common treatment of actions for injury and those for death, the court of appeals concluded, in effect, that the two were inseparable for the purpose of determining unconstitutionality. 735 S.W.2d at 247. Nothing has been brought to our attention in the legislative history of the Act to suggest that any consideration was ever given to separating actions for death and those for injury. Because the term "health care liability claim" inseparably includes both

---

2. *See* Tex.Rev.Civ.Stat.Ann. art. 4590i § 1.03(a)(4) (defining "health care liability claim" as a "cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in *injury to or death of* the patient") (emphasis supplied).

actions for injury and those for death, sections 11.02 and 11.03 are not partially invalid, but invalid in their entirety.

To uphold the damage limitations in this cause, the court strikes no word or words, but must rewrite the statute to redefine the term "health care liability claim" in sections 11.02 and 11.03 of the Act to mean only actions for wrongful death. As in *Hanks*, "the plain terms" of the statute do not permit this judicial intrusion into the legislative arena. The court's contrary interpretation blatantly conflicts with the legislature's intent that the term encompass both actions for injury and death throughout the Act's many sections, not just those limiting damages, but those relating to notice of the claim to the health care provider or physician, informed consent and disclosure, the applicability of the doctrine of *res ipsa loquitur*, and expert witnesses. These provisions, important to the Act's passage, were designed to benefit health care providers by reducing the number of frivolous suits against them and by placing controls on the type of testimony and witnesses offered at trial. If the court's decision today is to be applied with some measure of consistency, and is not just result oriented, the term "health care liability claim" throughout the statute now means only actions for death. This rash legislative choice by the court substantially weakens these provisions benefitting our state medical community.

The court's discussion confuses the terms "health care liability claim" and "medical malpractice claim" to draw the distinction between wrongful death and personal injury actions.[3] Sections 11.02

and 11.03 refer to only a single class of damages—those awarded in a health care liability action, whether for personal injury *or* death. The focus of the statute is not on the type of harm inflicted but on the nature of the defendant—a provider of health care services. The term "medical malpractice" similarly has never been employed previously in either case or statute to describe the extent of the injury inflicted; rather, it is a term synonymous with "health care liability."

A review of the statute confirms this conclusion. The term "medical malpractice" is used only once, in the findings and purposes section of the statute. There the legislature states that "the number of health care liability claims"—*inclusive of actions whether for personal injury and death*—"has increased since 1972 inordinately; [that] the filing of legitimate health care liability claims"—*inclusive of actions whether for personal injury and death*— "is a contributing factor affecting medical professional liability rates...." Tex.Rev. Civ.Stat.Ann. art 4590i § 1.02(a)(1), (2) (Vernon Supp.1990). The legislature found that this "situation"—of increased claims *whether for personal injury or death*— "has created a *medical malpractice* insurance crisis in the State of Texas...." *Id.* § 1.02(a)(5) (emphasis supplied). Surely the insurance referred to was not limited to coverage for personal injury inflicted by medical professionals, but also extended to death as well. Simply put the statute employed the term "medical malpractice" interchangeably with the term "health care liability." Neither of these terms differentiates between personal injury *and* death.[4]

The court further places great emphasis on the fact that the Act, when passed,

---

3. Contrary to the analysis in today's opinion, the holding in *Lucas* drew no distinction between personal injury and wrongful death. The court noted that writ had been granted in this cause yet failed to differentiate it in any respect. 757 S.W.2d at 690. Nor can the use of the term "medical malpractice damages" in *Lucas* be interpreted as a reference solely to personal injury damages, as the court's opinion concludes. The question certified in *Lucas*, in pertinent part, asked:

Whether the limitation on medical malpractice damages in Tex.Rev.Civ.Stat.Ann. art.

4590i §§ 11.02 and 11.03 (Vernon Supp.1986) is consistent with the Texas Constitution.... 757 S.W.2d at 687. We held that it was not. Neither the Fifth Circuit's use of the term "medical malpractice damages" nor our answer was limited to damages recoverable for personal injury.

4. The four opinions handed down in *Lucas* employ the terms interchangeably as well. *See, e.g., Lucas*, 757 S.W.2d at 689 (discussing damage limitations in "medical malpractice" statutes of other states); 695 (Gonzalez, J., dissenting)

included a "savings clause" common to legislative enactments.[5] But such a clause is not a cure-all: "A separability clause does not clothe the valid parts with immunity from the invalidating effect the law gives to the inseparable blending of the bad with the good." E. Crawford, *The Construction of Statutes* § 145 (1940); *see also Sutherland Statutory Construction, supra,* at § 44.08.

The legislature recognized the limitation on damages contained in section 11.02 might very well be found unconstitutional by this court, and made provision for that contingency in section 11.03 which commences:

> In the event that Section 11.02(a) of this subchapter is stricken from this subchapter or is otherwise invalidated by a method other than through legislative means, the following shall become effective....

Rather than contemplating a partial striking of Section 11.02, the legislature enacted a special and unique mechanism to replace the provision in its entirety if held invalid in any respect.

Moreover, given this concern as to unconstitutionality, it is particularly appropriate to assume that the legislature purposely chose the specific wording included in the severability clause as well as the other provisions of this Act. The language of the severability clause at issue here instructs the court to limit the effect of partial invalidity to the *"clause, sentence, subsection, section, article* or *provision"* held unconstitutional. In its rush to a result,

the court has ignored this clear legislative directive. There is no one clause, sentence, section, article or provision that can be excised from sections 11.02 and 11.03 and still leave a workable remainder. Rather, the court has viewed the "savings clause" as a legislative delegation to the judiciary of the power to write statutes. If the legislature had chosen different language for these sections, a different question would be presented. But it did not and the court must take the provisions of the Act as written, not as it might prefer to see the statute drafted.

The court's decision injects an unworkable uncertainty into Texas jurisprudence. Imagine portions of statutes long ago declared unconstitutional arising one by one from the grave. For having resuscitated an unconstitutional statute in this cause, what limit is there to revivification of others? What would prevent the City of Port Arthur from invoking the notice provision, held unconstitutional in *Hanks*, to actions for wrongful death? Or, similarly, why would the filing fees held unconstitutional in *LeCroy v. Hanlon,* 713 S.W.2d 335 (Tex. 1986), not now be argued as applying to death cases? These and other numerous possible examples highlight the error of carving out an exception to a long-standing rule of constitutional law and statutory construction in an attempt to validate sections 11.02 and 11.03 in this cause.

The court further distinguishes our holding in *Lucas* on the basis that it arose in answer to a certified question from a feder-

(statute distinguishes "medical malpractice claimants" from "other tort claimants"); 698, 699, 700 (Gonzalez, J., dissenting) (referring to the "medical malpractice" claimant, the "medical malpractice" plaintiff, "medical malpractice" actions and the "medical malpractice" insurance crisis); 701 (Culver, J., concurring) (discussing "medical malpractice" awards); 702 (Phillips, C.J., dissenting) (statute differentiates between persons suing for "medical malpractice" and those who sue for other torts); 709 n. 7 (Phillips, C.J., dissenting) (referencing "medical malpractice" damage limitations statutorily imposed in other states).

**5.** That clause provides:

If any provision of this statute or its application to any person or circumstance is held invalid or unconstitutional, such invalidity does not affect other provisions or applications of this statute which can be given effect without the invalid clause, sentence, subsection, section, article or provision or application, and shall not affect, impair, invalidate, or nullify the remainder of this Act, but the effect thereof shall be confined to the clause, sentence, subsection, section, article, or provision of the Act so adjudged to be invalid or unconstitutional and to this end the above are declared to be severable.
Act of Aug. 29, 1977, ch. 817, § 41.04.

al appellate court. In so doing, the court seriously erodes our authority to answer certified questions. Under article V, section 3–c of the Texas Constitution, we are empowered to "answer questions of state law certified from a federal appellate court." The only limitation imposed by Rule 114(a), Texas Rules of Appellate Procedure, is that state law be determinative of the cause then pending. Nowhere is there the remotest suggestion that a decision of this court on certified question is any less a controlling state precedent than a decision made on appeal from a state appellate court. This is simply not the law:

> Certification would be a pointless exercise unless the state court's answers are regarded as an authoritative and binding statement of state law. Thus the Fifth Circuit's early suggestion that answers to certified questions are "merely advisory and entitled, like dicta, to be given persuasive but not binding effect as a precedent," has long since been forgotten and it is now accepted that the state answers are binding.

C. Wright, A. Miller and E. Cooper, 17A *Federal Practice and Procedure* § 4248 at 179 (2d ed. 1988).[6] To hold otherwise would undermine the very purpose of the certification process—to ensure that the same state law is applied to litigants, whether in state or federal court. The federal courts are clearly bound by our decision in *Lucas, see* Wright, *supra*, and, in fact, have so held. *Wheat v. United States*, 860 F.2d 1256, 1259 (5th Cir.1988).[7]

Nor can I concur in the court's equal protection analysis. Unlike the rather unauthoritative opinion relied upon by the court today concerning the constitutionality of a statutorily limited class of beneficiaries in an action for wrongful death, *Castillo v. Hidalgo County Water District No. 1*, 771 S.W.2d 633 (Tex.App.—Corpus Christi 1989, no writ), the issue here is the distinction created between tort victims who are injured by a certain class of defendant—*i.e.,* health care providers—and those injured by others. Put another way, is it constitutional to create a favored class of tortfeasors—only health care providers—who are not required to pay full damages for the injuries they inflict? The court appears to find a basis for this distinction in the recited purposes of the Medical Liability and Insurance Improvement Act to reduce excessive claims, decrease insurance costs and making health care more affordable. That Act, however, was based upon the recommendations of the Texas Medical Professional Liability Study Commission, frequently referred to as the "Keeton Report," which could not conclude that there was any correlation between an arbitrary damage limitation and the Act's stated purposes.[8] Moreover, this court has previously recognized the absence of such a rational relationship.[9] By both disregarding this and providing only an extraordinarily superficial equal protection analysis, the court works a serious injustice both to those who are killed and to the meaning of a vital constitutional guarantee.

6. *Accord Penn Mutual Life Insurance Co. v. Abramson*, 530 A.2d 1202, 1207 (D.C.App.1987) (opinion on certified question "is *stare decisis* of this court, as well as *res judicata* as to the same parties in local courts"); *In re Elliott*, 74 Wash.2d 600, 610–11, 446 P.2d 347, 354 (1968) (decision on certified question "legal precedent applicable in all future controversies involving the same legal question until and unless the court overrules its opinion"); *In re Richards*, 223 A.2d 827, 832 (Me.1966) (judgment in certified proceedings treated "as having the force of decided case law within the courts of this state").

7. Today's decision may create a bifurcated standard of unconstitutionality of sections 11.02 and 11.03 dependent upon the nature of the forum,

state or federal. If, however, there had been no certification process available to the federal appellate court in *Lucas,* abstention would have been required, placing the parties before our state courts and resulting in the same answer to the same question. *See* Lillich and Mundy, *Federal Court Certification of Doubtful State Law Questions,* 18 U.C.L.A.L.Rev. 888, 907 (1971). The fact that certification avoids the abstention process should not alter the binding nature of the result.

8. *Lucas,* 757 S.W.2d at 691, *citing* Keeton Report at 7, 38.

9. *Id.*

Today's decision will no doubt come as a great shock to the many parties, lawyers and judges who have operated on the well-founded belief that the effect of *Lucas* was to render liability limitations unconstitutional in all cases. *See, e.g., Mercy Hospital v. Rios,* 776 S.W.2d 626, 637 (Tex.App.—San Antonio 1989, writ denied) (upholding, in a wrongful death action, trial court's refusal to order remittitur of damages awarded by jury in excess of statutory limit because "[t]he Texas Supreme Court in *Lucas v. United States* ... has held that the limitation on medical malpractice damages as set out in the above statute is unconstitutional."); *Wheat v. United States,* 860 F.2d at 1259 ("[a]s the parties agree, the *Lucas* decision moots the constitutional question in this [wrongful death] appeal."). Because I do not approve of the court's rejection of controlling precedent to become self-appointed legislative drafters, I dissent.

RAY and MAUZY, JJ., join in this dissent.